FILED
02 MAY 31 AM 9:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **HAMPTON PUGH CO., et al.,** | ] | |
| | ] | |
| Plaintiff(s), | ] | |
| | ] | |
| vs. | ] | CV-00-N-1307-W |
| | ] | |
| **MONSANTO COMPANY, et al.,** | ] | |
| | ] | |
| Defendant(s). | ] | |

ENTERED
MAY 31 2002

## Memorandum of Opinion

### I. Introduction

The court has for consideration two motions to dismiss, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, by the defendants Monsanto Company and Delta & Pine Land Company (hereinafter "Delta Pine"). (Doc. # 44, 46). The differences between the motions are negligible, as both largely attack the amended class action complaint that is the basis for this action on the grounds that it fails to sufficiently state a claim against either defendant under the federal antitrust laws set forth in the Sherman and Clayton Acts, or the laws of the State of Alabama. The issues have been briefed by the parties, and the court finds the questions presented now ripe for decision. Upon due consideration, the motions to dismiss are due to be granted in part and denied in part.

### II. Background

#### A. The Parties and their Relations

Four plaintiffs serve as representatives in this putative class action. The first is plaintiff Hampton Pugh Company (hereinafter "Hampton Pugh"), an Arkansas sole

57

proprietorship with its principal place of business in McGehee, Arkansas. The second plaintiff is Forest Lee Wiggins Farm, Inc. (hereinafter "Wiggins Farm"), located in Ralph, Alabama. The third plaintiff is Forest Wiggins, an Alabama cotton farmer working in Ralph, Alabama. The fourth plaintiff is Terry Wynne, a Mississippi cotton farmer working in Pickens, Mississippi.

Hampton Pugh brings the above-styled action pursuant to Rule 23(b)(2), (3) of the Federal Rules of Civil Procedure, on behalf of itself and a putative class of Direct Purchaser plaintiffs.[1] Wiggins Farm and Messrs. Wiggins and Wynne bring the above-styled action pursuant to Rule 23(b)(2), (3) of the Federal Rules of Civil Procedure, on behalf of themselves and a putative class of Indirect Purchaser plaintiffs.[2]

---

[1] The Direct Purchaser Class consists of the following:

> All persons and entities (excluding Monsanto, Delta Pine and their officers, directors and employees, and governmental entities) who purchased upland cotton seed in the United States, including both conventional and genetically modified cotton seed, at any time from January 1, 1996, to the present, directly from Monsanto or Delta Pine or their selling agents.

Amended Class Action Complaint, ¶ 43.

[2] The Indirect Purchaser Class consists of the following:

> All persons and entities (excluding Monsanto, Delta Pine and their officers, directors and employees, and governmental entities) who purchased upland cotton seed in the United States, including both conventional and genetically modified cotton seed, at any time from January 1, 1996, to the present produced by or containing licensed genetic traits owned by the Defendants or any of their selling agents or distributors.
>
> All persons and entities (excluding Monsanto, Delta Pine and their officers, directors and employees, and governmental entities) who purchased genetically modified glyphosate-tolerant upland cotton seed (Roundup Ready or Bollgard with Roundup Ready) in the United States from January 1, 1996, to the present, under an agreement or requirement that, if the purchaser used any glyphosate herbicide in connection with the seed, the purchaser was required to use one of the "Roundup" branded herbicides.
>
> All persons and entities (excluding Monsanto, Delta Pine and their officers, directors and employees, and governmental entities) who purchased genetically modified glyphosate-tolerant upland cotton seed and one of the "Roundup" branded herbicides from January 1, 1996, to the present.

Defendant Monsanto is a Delaware corporation, with a principal place of business in St. Louis, Missouri. According to the complaint, Monsanto has developed the technology for a genetically modified form of upland cotton seed[3] that is tolerant to glyphosate, a chemical used in herbicides. Monsanto apparently produces and licenses this genetically modified glyphosate-tolerant upland cotton seed (hereinafter "GMGT") under such trade names as "Roundup Ready" and "Bollgard with Roundup Ready" to its seed company partners for production. Monsanto also produces glyphosate herbicides, such as "Roundup" or "Roundup Ultra."[4] Defendant Delta Pine is also a Delaware corporation, with a principal place of business in Scott, Mississippi. According to the complaint, Delta Pine is in the business of marketing and selling upland cotton seeds, including GMGT seeds containing Monsanto's proprietary traits.

According to the complaint, Hampton Pugh is engaged in the business of selling agricultural seeds and supplies. During the relevant time period described in the complaint – 1996 to the present – Hampton Pugh purchased upland cotton seed, including GMGT seed, from Delta Pine, and purchased glyphosate herbicides (i.e., Roundup herbicides) from Monsanto. The complaint specifically alleges that the GMGT seed purchased by

---

Amended Class Action Complaint, ¶ 44.

[3]According to the complaint, upland cotton is a type of cotton genetically distinct from pima cotton. The complaint does not elaborate on the distinction, but merely notes that the causes of action set forth therein relate only to the upland cotton seed market. Although not relevant for any purpose beyond the court's own edification, a brief and by no means comprehensive internet search suggests that pima cotton seeds have a greater natural resistance to insects than upland cotton seed, are virtually lint free (a characteristic evidently important when the seed is used as a dietary supplement for cattle), and produce a greater economic yield than upland seed.

[4]According to the complaint, glyphosate herbicides were rarely used in the upland cotton seed industry until the advent of GMGT seed.

Hampton Pugh was sold by Delta Pine under a licensing agreement with Monsanto. The herbicide itself is apparently sold directly by Monsanto. Amended Class Action Complaint, ¶ 7 (emphasis added).

Wiggins Farm and Messrs. Wiggins and Wynne also purchased seed from Delta Pine (including GMGT seed) during the time period relevant to the complaint, although based upon the allegations it appears that they purchased this seed for a purpose other than resale. *The complaint specifically alleges that the seed purchased by these three plaintiffs was not purchased directly from Delta Pine, but from Delta Pine through distributors such as Hampton Pugh under a licensing agreement with Monsanto*. The herbicide purchased by Wiggins Farm was likewise sold by Monsanto through distributors. Moreover, as a condition precedent to the purchase of GMGT seed, Wiggins Farm and Messrs. Wiggins and Wynne were required to enter into a Technology User Agreement (hereinafter "TUA"). This agreement, *inter alia*, stated that "if a herbicide containing the same active ingredient as Roundup Ultra herbicide (or one with a similar mode of action) is used over the top of Roundup Ready crops, you (the farmer) agree to use only Roundup branded herbicide." Amended Class Action Complaint, ¶ 8 (emphasis added).

**B. The Antitrust Allegations**

Beginning in 1996, Monsanto and Delta pine allegedly engaged in comprehensive corporate acquisition programs. Monsanto's program approached the $8 billion mark, and included a large number of acquisitions, mergers, and other financial alignments with biotechnology and seed companies – all of whom were apparently participating in various aspects of genetically modified seed production and marketing. One particular company

acquired by Monsanto was Stoneville Pedigreed Seed Company (apparently the only major cotton seed company not owned by Delta Pine). The complaint does not allege the financial value of Delta Pine's program, but states that Delta Pine acquired, merged, or gained an ownership interest in four separate cotton seed companies – all of whom were in the business of producing and marketing upland cotton seed and its genetic variants.

As to the two defendants themselves, the complaint alleges that in 1992, Monsanto and Delta Pine began working together to develop genetically modified cotton seed for commercial resale. Monsanto licensed two genetic traits to Delta Pine for use – a Bacillus thuringensis gene and a glyphosate tolerant gene – and aided Delta Pine in the development of commercial cotton varieties containing these two genes. Bacillus thuringensis cotton seed[5] reached the market in 1996; glyphosate cotton seed[6] reached the market in 1997.

The product market in which these seeds are sold, for purposes of the complaint, is the upland cotton seed market.[7] The geographic market is the United States Cotton Belt.[8] According to the complaint, 78 percent of the upland cotton seed market is occupied by

---

[5]The complaint alleges that Bacillus thuringensis cotton contains a naturally occurring protein that kills certain insects without the use of pesticides. Bacillus thuringensis cotton seed is sold under the Monsanto trade name of Bollgard. Amended Class Action Complaint, ¶ 16.

[6]The complaint alleges that glyphosate-tolerant cotton is resistant to glyphosate herbicides applied directly to the cotton plant. Glyphosate-tolerant cotton is sold under the Monsanto trade name of Roundup Ready. Amended Class Action Complaint, ¶ 16.

[7]This market apparently contains submarkets for genetically modified cotton seed and conventional cotton seed (i.e., cotton seed not genetically modified).

[8]According to the complaint, the United States Cotton Belt includes the following states: Alabama, Arizona, Arkansas, California, Florida, Georgia, Louisiana, Mississippi, Missouri, New Mexico, North Carolina, Oklahoma, South Carolina, Tennessee, Texas, and Virginia. The belt is apparently divided into four regional submarkets: Southeastern, South Central, Southwest, and West.

genetically modified cotton seed.[9] Sixty (60) percent of the upland cotton seed market is controlled by GMGT seed.[10] The complaint is not entirely clear as to the exact shares of the market held by Monsanto and Delta Pine. The plaintiffs at one point aver a market share of "over as much as 90 percent of the domestic upland cotton seed market and its supply of elite germ plasm, the patents covering the gene-splicing techniques, and ownership over virtually all of the patents for valuable gene modified traits." Amended Class Action Complaint, ¶ 19. The plaintiffs seem to clarify this allegation later in their complaint, however, through a chart that delineates the defendants' market share in the upland cotton seed market between 1996 and 2001. In the years 1996, 2000, and 2001, Delta Pine (and companies allegedly under its control) held market shares of 72.4 percent, 78.9 percent, and 75.6 percent respectively. In the years 1997 through 1999, Delta Pine held market shares of 73.4 percent, 71.4 percent, and 77.5 percent respectively. Monsanto – through its acquisition of Stoneville Pedigreed – held market shares of 11.3 percent, 16.2 percent, and 12.7 percent respectively. During the years of 1997-1999, Delta Pine and Monsanto held collective market shares of 84.7 percent, 87.6 percent, and 90.2 percent respectively. Amended Class Action Complaint, ¶ 30.[11] With respect to the submarket for genetically modified cotton seed, the complaint alleges that during the years 1996-2001, Monsanto and Delta Pine held the following markets shares: 99.86 percent of the genetic cotton seed

[9]The complaint details a striking rise in the market share of genetically modified cotton during the last several years. In 1996, genetically modified cotton possessed 12 percent of the upland cotton seed market.

[10]The complaint does not detail what product controls the remaining 18 percent of the upland cotton seed market controlled by genetically modified seeds.

[11]According to the complaint, the Federal Trade Commission and the United States Department of Justice forced Monsanto to divest its interest in Stoneville Pedigreed in 1999.

market, which was 12 percent of all upland cotton seed sold in the United States in 1996; 97.7 percent of the genetic cotton seed market, which was 23 percent of all upland cotton seed sold in the United States in 1997; 93.9 percent of the genetic cotton seed market, which was 45 percent of all upland cotton seed sold in the United States in 1998; 92.7 percent of the genetic cotton seed market, which was 60 percent of all upland cotton seed sold in the United States in 1999; 93 percent of the genetic cotton seed market, which was 72.1 percent of all upland cotton seed sold in the United States in 2000; 96.5 percent of the genetic cotton seed market, which was 78 percent of all upland cotton seed sold in the United States in 2001.  Amended Class Action Complaint, ¶ 32 (citing a report from the Cotton Division of the United States Department of Agriculture Agricultural Marketing Service).

According to the complaint, Monsanto intended to incorporate Delta Pine into a conspiracy and combination, thereby wielding the shared cotton seed market power of the two companies to exclude competition.  Monsanto and Delta Pine allegedly agreed that Delta Pine would market and sell to distributors and cotton farmers seed containing Monsanto's proprietary traits, under both Monsanto brand names and Delta Pine brand names, and under terms and conditions that would result in an unlawful anti-competitive exclusion of competition.

Monsanto's intentions are allegedly modeled after its Maize Protection Business Plan, a plan addressing the genetically modified corn seed market.  According to the complaint, the plan outlined a scheme whereby Monsanto would license genetically modified cotton seed technologies to its marketplace competitors.  Through these licensing agreements, Monsanto would be able to create barriers to entry in the marketplace by

controlling both the network for distribution of genetically modified seeds and the price of these seeds. The latter aspect of this plan was allegedly effectuated through a grower agreement.

> A grower agreement is a license with the grower that allows the grower use of gene technology. In return, the grower pays a "tech fee" along with the price of the maize seed. The tech fee will be set by Monsanto and will be listed on the maize seed invoice. . . . It will be collected by the seed companies. It will be negotiated as to how Monsanto and the seed companies will split the tech fee. . . . The major advantage of the grower license approach is that Monsanto can regulate the price being charged to the end user [farmer]. The revenue generated from the traits can be set by Monsanto as opposed to being entirely at the mercy of the seed company pricing decisions.

Amended Class Action Complaint, ¶ 25 (quoting the Maize Business Protection Plan).

The alleged grower agreement in the instant action is the technology user agreement. The plaintiffs contend that the technology user agreement extracts anti-competitive and unreasonable fees and obligations from the farmers who enter into them, including: a technology fee[12] for which there is no limit; a liquidated damages provision imposing damages at 120 times the technology fees; severe and unreasonable limitation of warranties and remedies provisions; a forum selection clause requiring farmers to bring claims in St. Louis, Missouri; a prohibition against seed reuse; and a tying of the use of the genetically modified cotton seed to the use of Roundup herbicide. Amended Class Action Complaint, ¶ 34.

---

[12] The plaintiffs claim that Monsanto pays a portion of the technology fees charged as royalties to the seed company partners (e.g., Delta Pine) to create barriers to the entry of new genetic variants in upland cotton seed. They also contend that the payment of the royalties is the financial incentive for the seed companies to participate in the conspiracy and combination.

The complaint also alleges that the technology user agreement effectuated an unlawful tying arrangement, by tying purchases of GMGT seed

> to a requirement that if the grower used glyphosate herbicide on the resulting crop, the purchaser was required to purchase from Monsanto one of the "Roundup" glyphosate herbicides (Monsanto proprietary glyphosate herbicide) to the exclusion of competitors' substantially similar and interchangeable glyphosate herbicides . . . . Specifically, the TUA mandates that "if a herbicide containing the same active ingredient as Roundup Ultra herbicide (or one with a similar mode of action) is used over the top of Roundup Ready crops, you (the farmer) agree to use only Roundup branded herbicide."

Amended Class Action Complaint, ¶ 38. The complaint further alleges that Monsanto and Delta Pine required their distributors (e.g., Hampton Pugh) to condition the sale of GMGT seed on the requirement that purchasers agree to enter into the technology user agreement. According to the complaint, the alleged benefit of the tying arrangement to Monsanto and Delta Pine grew from the fact that the arrangement allowed Monsanto to maintain a higher level of profitability of Roundup herbicides after the expiration of the patents on these products – expected to take place in 2000 – by requiring their use on GMGT seed.

**C. The Claims**

Plaintiffs bring four counts by their action against Monsanto and Delta Pine. The first count alleges a violation of § 2 of the Sherman Act. *See* 15 U.S.C. § 2.[13] In this count, the plaintiffs maintain that Monsanto and Delta Pine have engaged in anti-competitive behavior

---

[13] Section 2 of the Sherman Act provides:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

in the upland cotton seed market in the United States Cotton Belt by using their market power to control and increase their market share and reduce competition – namely through the imposition of technology user agreements and the terms contained therein. The second count alleges a violation of § 1 of the Sherman Act. *See* 15 U.S.C. § 1.[14] In this count, the plaintiffs maintain that Monsanto, Delta Pine, and unnamed co-conspirators have engaged in a combination and conspiracy in the restraint of trade to, *inter alia*, obtain monopoly control over the upland cotton seed market in the United States, restrict competition in this market, restrain trade, fix prices in this market, and restrict the capability of cotton farmers to save seed (thereby increasing "the cartels' profits").

The third count alleges a violation of § 3 of the Clayton Act and § 1 of the Sherman Act. *See* 15 U.S.C. § 14;[15] *see also* 15 U.S.C. § 1. In this count, the plaintiffs claim that the defendants, by means of the technology user agreements, tied the purchase of Roundup

---

[14] Section 1of the Sherman Act provides:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

[15] Section 3 of the Clayton Act provides:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies or other commodities, whether patented or unpatented, for use, consumption or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

glyphosate herbicides to the purchase of GMGT seed by the indirect purchaser plaintiffs. The defendants also required the direct purchaser plaintiffs to condition the sale of GMGT seed on the requirement that purchasers of said seed enter into technology user agreements. These arrangements allegedly resulted in an unlawful and unreasonable restraint on trade and competition. Finally, the fourth count pleads a claim for unjust enrichment.

## III. Standard

A motion to dismiss tests the legal sufficiency of a complaint. *Brooks v. Blue Cross & Blue Shield*, 116 F.3d 1364, 1368 (11th Cir. 1997). The court may dismiss a complaint only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hughes v. Rowe*, 449 U.S. 5, 10 (1980); *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). For the purpose of ruling on a 12(b)(6) motion to dismiss, the court accepts as true all well-pleaded factual allegations of the complaint. Moreover, all reasonable inferences drawn therefrom are viewed in light most favorable to the plaintiff. *See Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1198 n.2 (11th Cir. 2001); *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Burch v. Apalachee Community Mental Health Servs.*, 840 F.2d 797, 798 (11th Cir. 1988) (en banc).

"Notice pleading is all that is required for a valid antitrust complaint." *Lombard's, Inc. v. Prince Mfg., Inc.*, 753 F.2d 974, 975 (11th Cir. 1985); *see also Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993). "Under notice pleading the complaint need only give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Lombard's*, 753 F.2d at 975 (quotations omitted).

Indeed, "in an antitrust suit where the proof and details of the alleged conspiracy are largely in the hands of the alleged co-conspirators . . ., a complaint should not be dismissed unless it is found to be wholly frivolous." *Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 995 (11th Cir. 1983) (quotations and citations omitted). "Nevertheless, enough data must be pleaded so that each element of the alleged antitrust violation can be properly identified. Conclusory allegations will not survive a motion to dismiss if not supported by the facts constituting a legitimate claim for relief." *Lombard's*, *supra*. "[A] complaint may be dismissed when it fails to allege some fact that is essential to the cause of action. The Supreme Court has observed that 'it is not . . . proper to assume that the plaintiff can prove any facts that it has not alleged.'" 2 Phillip E. Areeda et al., *Antitrust Law* ¶ 307c1, at 71 (2d ed. 2000) (quoting *Associated Gen. Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526 (1972)).

## IV. Discussion

### A. The *Illinois Brick* Doctrine

The defendants advance several arguments in support of their motions to dismiss the complaint. Many of these arguments are not properly resolved on a motion to dismiss. One, however, warrants extended discussion, as the court believes it significantly impacts both classes of plaintiffs.

The defendants contend that the *Illinois Brick* doctrine precludes the indirect purchaser plaintiffs from maintaining their antitrust claims. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). The indirect purchasers respond that the *Illinois Brick* doctrine has no applicability here. They maintain that the complaint does not allege so-called "pass-on"

damages – a necessity for *Illinois Brick* application in their opinion – and further argue that they are actually direct purchasers of a tying product – GMGT seed – by virtue of the technology user agreement, which places them in contractual privity with Monsanto and precludes the application of *Illinois Brick.*

The *Illinois Brick* doctrine is a rule of antitrust standing, and builds upon the United States Supreme Court case of *Hanover Shoe*. *See generally Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968). In *Hanover Shoe*, the Supreme Court held that direct, rather than indirect purchasers, were the parties injured by a violation of the antitrust laws.

> [E]xcept in certain limited circumstances, a direct purchaser suing for treble damages under § 4 of the Clayton Act is injured within the meaning of § 4 by the full amount of the overcharge paid by it and that the antitrust defendant is not permitted to introduce evidence that indirect purchasers were in fact injured by the illegal overcharge.

*Illinois Brick*, 431 U.S. at 724-25 (citing *Hanover Shoe*, 392 U.S. at 494).[16] In rendering this holding, the Court rejected the so-called pass-on defense: ". . . the overcharged buyer [the direct purchaser] could only charge his customers [the indirect purchasers] a higher price *because* the price to him was higher." Thus, the direct purchaser suffers no injury (and is thus not the proper party to the action) because the indirect purchasers absorb the allegedly illegal overcharge (and thus suffered the injury) through a pass on from the direct purchaser in the form of higher prices. *Hanover Shoe*, 392 U.S. at 491-92; *see also In re*

---

[16] The court reasoned that a contrary rule would unnecessarily "complicate treble-damages actions with attempts to trace the effects of the overcharge on the purchaser's prices, sales, costs, and profits, and of showing that these variables would have behaved differently without the overcharge." Moreover, a contrary rule would discourage enforcement of the antitrust laws, and allow violators to "retain the fruits of their illegality." *Illinois Brick*, 431 U.S. at 725 (citations and quotations omitted).

*Beef Industry Antitrust Litigation*, 600 F.2d 1148, 1153 n.2 (5th Cir. 1979) (describing "pass on" as "the process whereby a middleman in the chain of distribution who has been overcharged by a manufacturer or by a producer adjusts his prices upward in sales to a lower level in the chain to reflect the overcharge."). As support for its decision the Court cited an "unwillingness to complicate treble-damages actions with attempts to trace the effects of the overcharge on the purchaser's prices, sales, costs, and profits, and of showing that these variables would have behaved differently without the overcharge"; as well as concern that unless direct purchasers were allowed to sue for the portion of the overcharge arguably passed on to indirect purchasers, antitrust violators would retain the fruits of their illegality because indirect purchasers would have only a tiny stake in the lawsuit and hence little incentive to sue." *Illinois Brick*, 431 U.S. at 724-25 (citing *Hanover Shoe*, 392 U.S. at 492-94).

In *Illinois Brick*, the Court held that an indirect purchaser plaintiff could not use the pass-on theory of recovery offensively. *See Illinois Brick*, 431 U.S. at 735-36. To allow the offensive use of the pass-on theory, according to the Court, "would create a serious risk of multiple liability for defendants . . . [and] duplicative recoveries . . . ." *Illinois Brick*, 431 U.S. at 730. Moreover, the same concerns driving the Court in *Hanover Shoe* – namely the legal and economic complexities of allowing proof of pass-on – presented themselves in *Illinois Brick*. "The evidentiary complexities and uncertainties involved in the defensive use of pass-on against a direct purchaser are multiplied in the offensive use of pass-on by a plaintiff several steps removed from the defendant in the chain of distribution." *Illinois*

*Brick*, 431 U.S. at 732. The Court recognized the policy implications of its decision. Nonetheless, it adhered to the rationale set forth in *Hanover Shoe*.

> We think the longstanding policy of encouraging vigorous private enforcement of the antitrust laws, supports our adherence to the *Hanover Shoe* rule, under which direct purchasers are not only spared the burden of litigating the intricacies of pass-on but also are permitted to recover the full amount of the overcharge. We recognize that direct purchasers sometimes may refrain from bringing a treble-damages suit for fear of disrupting relations with their suppliers. But on balance, and until there are clear directions from Congress to the contrary, we conclude that the legislative purpose in creating a group of private attorneys general to enforce the antitrust laws under § 4 [of the Clayton Act] is better served by holding direct purchasers to be injured to the full extent of the overcharge paid by them than by attempting to apportion the overcharge among all that may have absorbed a part of it.
>
> It is true that, in elevating direct purchasers to a preferred position as private attorneys general, the *Hanover Shoe* rule denies recovery to those indirect purchasers who may have been actually injured by antitrust violations. Of course, as MR. JUSTICE BRENNAN points out in dissent, "from the deterrence standpoint, it is irrelevant to whom damages are paid, so long as some one redresses the violation." But § 4 has another purpose in addition to deterring violators and depriving them of "the fruits of their illegality"; it is also designed to compensate victims of antitrust violations for their injuries.

*Illinois Brick*, 431 U.S. at 745-46 (citations and quotations omitted).

Recently, the Eleventh Circuit declined to apply *Illinois Brick* in the context of a vertical conspiracy with no allegations of pass on of allegedly illegal overcharges. *See generally Lowell v. American Cyanamid Co.*, 177 F.3d 1228 (11th Cir. 1999). In rendering its decision, the court noted that it effected no change in the law. Instead it simply recognized what other courts had come to call the vertical conspiracy exception to the *Illinois Brick* doctrine. *See Lowell*, 177 F.3d at 1231 (and cases cited); *see also Gravity, Inc. v. Microsoft Corp. (In re Microsoft Corp. Antitrust Litigation)*, 168 F. Supp. 2d 541, 545 (D.

Md. 2001). That exception, according to the court, recognized the inapplicability of *Illinois Brick* and its rationale to situations involving a vertical conspiracy without pass-on overcharges or damages. As the court explained:

> *Illinois Brick* was an extension of the Court's earlier prohibition against the *defensive* use of passing on in [*Hanover Shoe*]. In concluding that the indirect . . . purchasers of a product may not sue distant manufacturers, *Illinois Brick* cited two underlying rationales. The first of these was that allowing offensive but not defensive use of pass-on would create a serious risk of multiple liability for defendants. Even though an indirect purchaser had already recovered for all or part of an overcharge passed on to it, the direct purchaser would still recover automatically the full amount of the overcharge that the indirect purchaser had shown to be passed on. Second, as in *Hanover Shoe,* the Court was worried about the uncertainties and difficulties in analyzing price and out-put decisions in the real economic world rather than an economist's hypothetical model, and of the costs to the judicial system and the efficient enforcement of the antitrust laws of attempting to reconstruct those decisions in the courtroom.
>
> Neither of the rationales applies to the very different case of vertical conspiracy with no allegations of passing on:
>
>> *Illinois Brick* does not limit suits by consumers against a manufacturer who illegally contracted with its dealers to set the latter's resale price. The consumer plaintiff is a direct purchaser from the dealer who, by hypothesis, has conspired illegally with the manufacturer with respect to the very price paid by the consumer. There is no problem of duplication or apportionment because the consumer is the only party who has paid any overcharge. Although the manufacturer did not sell directly to the consumer, he is a fellow conspirator with the direct-selling dealer and therefore jointly and severally liable with the dealer for the consumer's injury.

*Lowell*, 177 F.3d at 1229-30 (citations, quotations and footnotes omitted) (citing 2 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law 264 (rev. ed.1995)).

The plaintiffs proffer three arguments in support of their contention that *Illinois Brick* does not apply to the instant complaint. First, they contend *Lowell* limits *Illinois Brick* to

those instances "where the wrongdoing identified by the plaintiffs includes 'pass-ons' of illegal overcharges." Second, they contend that the contractual privity existing between the indirect purchaser plaintiffs and Monsanto by virtue of the technology user agreement transforms the indirect purchasers into direct purchasers, and thus beyond the scope of *Illinois Brick*. Third, they contend that the allegedly unlawful tying arrangement forced upon the indirect purchasers was not consummated until the indirect purchasers entered into the technology user agreements. Therefore, the direct purchasers never passed any illegal overcharge to the indirect purchasers. Because the first and third arguments are related, the court begins its discussion with the second argument.

The policy considerations driving *Illinois Brick* and *Hanover Shoe* are not concerned with the presence or absence of contractual privity between antitrust plaintiffs and defendants. *See Vacco v. Microsoft Corp.*, No. 16566, 793 A.2d 1048, 2002 Conn. LEXIS 132, at *40-*41 (Conn. April 16, 2002) (applying *Illinois Brick* doctrine and rejecting argument that an end-user of Microsoft Windows 98 who entered into a licensing agreement with the software manufacturer but did not purchase the software directly from the manufacturer or pay licensing rights directly to the manufacturer nonetheless had standing to sue the manufacturer under state antitrust act); *Siena v. Microsoft Corp.*, 2002 R.I. LEXIS 97, *10-*11 (R.I. May 9, 2002) (same); *cf. Illinois Brick*, 431 U.S. at 751 (Brennan J., dissenting)

> ([T]he requirement of privity between plaintiff and defendant was a reason to deny defendant the pass-on defense, since otherwise the defendant would be able to profit by his own wrong. *Hanover Shoe* [and conversely *Illinois Brick*] cannot be read, however, as limiting actions to parties in privity with one another. That was made clear in *Perkins v. Standard Oil Co.*, 395 U.S. 642, 648 (1969), decided the next Term, a price discrimination case in which the Court traced an illegal overcharge through several levels in the chain of

> distribution, ultimately holding that a plaintiff seeking to recover damages need show only a causal connection between the price discrimination in violation of the [antitrust laws] and the injury suffered.) (quotations omitted);

*Mid-West Paper Prods. Co. v. Continental Group, Inc.*, 596 F.2d 573, 596-97 (3d Cir. 1979) (Higginbotham, J., dissenting in part) (discussing antitrust standing and noting that a requirement of privity generally rejected in favor of proximate causation). *See also Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1497 (11th Cir. 1985) ("[T]he Supreme Court's policy against granting standing where the possibility exists of duplicative recovery by the indirectly injured plaintiff and the more directly injured person who has yet to sue has long been part of [the Eleventh Circuit's] and the former Fifth Circuit's target area test [for standing]." (citations omitted)). As the Supreme Court of Connecticut recently explained in a case involving *Illinois Brick* and a lawsuit against Microsoft Corporation:

> The rationale underlying *Illinois Brick* and its progeny is that restricting standing to a *direct purchaser* who has purchased goods *directly* from the antitrust defendant will maximize the effective enforcement of antitrust statutes "by concentrating the full recovery for the overcharge in the direct purchasers . . . ." Thus, the court's focus was on the underlying economic transaction between the direct purchaser and the antitrust defendant and not, as the plaintiff contends, whether the plaintiff and the defendant were in contractual privity by virtue of a licensing agreement.

*Vacco*, 793 A.2d 1048, 2002 Conn. LEXIS 132, at *40 (quoting *Illinois Brick*, 431 U.S. at 735; citations omitted; emphasis in original); *see also Associated Gen. Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 543-44 (1983); *Blue Shield of Virginia v. McCready*, 457 U.S. 476-78 (1982). The plaintiffs' allegations of privity are, therefore, no real answer to the *Illinois Brick* doctrine. A real answer lies in an analysis of the transactions underlying this action.

With respect to the indirect purchaser plaintiffs, the following allegations detail the economic transactions involving them.

- Hampton Pugh Company is engaged in the business of selling agricultural seeds and supplies. During the relevant time, Hampton Pugh Company purchased for resale upland cotton seed from Delta Pine . . . . In addition, Hampton Pugh Company purchased "Roundup" herbicide from Monsanto. Amended Class Action Complaint, ¶ 7.

- . . . Wiggins Farm [Forest Wiggins and Terry Wynne] purchased upland cotton seed from Delta Pine, including GMGT seed . . . . In addition, Wiggins Farm [and Messrs. Wiggins and Wynne] purchased "Roundup" herbicide from Monsanto. The genetically modified upland cottonseed is sold by Delta Pine through distributors under a licensing agreement with Monsanto. The herbicide is sold by Monsanto through distributors. Amended Class Action Complaint, ¶¶ 8, 9; *see also* ¶ 10.

- Monsanto and Delta Pine also required their distributors (such as Hampton Pugh) to condition the sale of their proprietary GMGT cotton seed on the requirement that the purchaser thereof agree to the TUA and other requirements . . . . Amended Class Action Complaint, ¶ 39.

These allegations demonstrate that the indirect purchaser plaintiffs purchased cotton seed and herbicide from distributors of Delta Pine and Monsanto. Thus, for purposes of standing under *Illinois Brick*, the relationship between the indirect purchaser plaintiffs and the defendants is separated by intervening distributors, such as Hampton Pugh. Clearly then this relationship is the type that implicates *Illinois Brick*.

Plaintiffs' remaining two arguments attempt to circumvent this problem. As noted *supra*, they first maintain that they have not alleged pass-on damages, and that under *Lowell* such pleading precludes the application of *Illinois Brick*. Plaintiffs' invocation of *Lowell* is proper, but incomplete. The exception recognized in *Lowell* is comprised of two parts: "*vertical conspiracies* with *no allegations of pass-on*" damages. *Lowell*, 177 F.3d at

1231 (emphasis added). Or, as the court itself phrased matters: "[T]he rule announced today: *Illinois Brick* does not apply to a single vertical conspiracy where the plaintiff has purchased directly from a conspiring party in the chain of distribution." *Lowell*, 177 F.3d at 1232. Plaintiffs ignore the former half of the exception, believing that their complaint – and the purported absence of pass-on allegations – satisfactorily pleads the vertical conspiracy exception. Whether or not plaintiffs' could satisfy the vertical conspiracy exception in such a manner[17] is not a question this court must reach, however, because the court believes that a fair reading of the complaint, in a light most favorable to the separate classes of plaintiffs represented, establishes allegations of *both* pass-on damages and a vertical conspiracy.

The plaintiffs make the following allegations:

- With the agreement of those companies to participate in the scheme, Monsanto would be able to preclude competitors from entering the marketplace by controlling the network for the distribution of genetically-modified seeds. Monsanto would then be able to control the price of genetically-modified seeds. Amended Class Action Complaint, ¶ 23 (citing the Maize Business Protection Plan).

- *The major advantage of the grower license approach is that Monsanto can regulate the price being charge to the end user [farmer]. The revenue generated from the traits can be set by*

---

[17]The court is doubtful that the plaintiffs' could satisfy the exception this way, and believes the *Lowell* court offered caution in this regard:

> Considering the loose nature of notice pleadings, a potential plaintiff might allege only a vertical conspiracy when there is in fact a horizontal conspiracy as well or some other kind of illegal conduct (for example, tying or monopolistic behavior). By so doing, some clever plaintiff could elude a defendant's 12(b)(6) motion but then later recover in the lawsuit for the pass-on injury of a horizontal conspiracy--the kind of injury for which a middleman could also recover. This circumstance could present the *Illinois Brick* double-recovery problem. So, courts must be attentive in holding plaintiffs to their pleadings . . . .

*Lowell*, 177 F.3d at 1230 n.4.

> *Monsanto as opposed to being entirely at the mercy of seed company pricing decisions.* Amended Class Action Complaint, ¶ 25 (quoting the Maize Business Protection Plan) (emphasis in original).

- This tying arrangement results in an unlawful and unreasonable restraint on trade and competition in that the distributors are prohibited by Monsanto and Delta Pine from selling any competitor's glyphosate herbicides (on which the distributor could realize greater income) in connection with the sale of Monsanto and Delta Pine's GMGT upland cotton seed.

- The defendants are not authorized under the law of any state to engage in the practices described [in this complaint], or to obtain monies they have been paid under the unlawful and unreasonable tying arrangement alleged [in this complaint], or pursuant to the anti-competitive conduct on account of their monopoly power in the relevant markets.

  The wrongful acts of defendants in charging and accepting a supra-competitive price for "Roundup" in its various formulations as alleged [in this complaint] *has resulted in an unjust enrichment to them to the detriment of plaintiffs and members of both classes.* Amended Class Action Complaint, ¶¶ 79, 80 (emphasis added).

These allegations of fact and the reasonable inferences taken from them establish the pass-on of illegal overcharges to the indirect purchaser plaintiffs, *at least* insofar as the complaint sets forth claims predicated on the defendants' allegedly unlawful behavior in the upland cottonseed market (e.g., price fixing), in violation of §§ 1 and 2 of the Sherman Act.

The same cannot be said, however, for the allegations supporting the purportedly unlawful tying arrangements. As noted *supra*, the plaintiffs contend that the allegedly unlawful tying arrangement affecting the indirect purchaser plaintiffs did truly not exist until the indirect purchaser plaintiffs were forced to enter into the technology user agreements. The so-called tying arrangement affecting the direct purchasers was a different type of injury: namely the direct purchasers being "required" by Monsanto and Delta Pine to make

the indirect purchaser plaintiffs enter into the technology user agreements at the time of their GMGT seed purchase. Thus, no damages resulting from the former tie could have accrued until the actual time of agreement entry, precluding any allegation that the direct purchasers passed on anything illegal to the indirect purchasers with respect to that particular tie. In support of this argument, the plaintiffs direct the court to the following language from the Eleventh Circuit:

> An illegal tie is not consummated, and its anticompetitive effects are not realized, until the tied purchaser is forced to forego his free choice among competitors, and competitors are thereby denied free access to the market. Here, the alleged effect was not felt until [the plaintiff] was required to purchase the tied product from a designated source as a condition to being able to purchase the tying product--racing services. In contrast, *when the indirect purchaser doctrine has been invoked to deny a plaintiff standing, there has always been an upstream purchaser who had been subjected to the anticompetitive conduct and experienced the antitrust injury.*

*Sports Racing Services, Inc. v. Sports Car Club of America, Inc.*, 131 F.3d 889 (11th Cir. 1997) (emphasis added).

The court believes the plaintiffs properly differentiate between the two alleged ties. Suffice it is to say that Hampton Pugh has not suffered from the same anticompetitive conduct and injury as the indirect purchaser plaintiffs. Amended Class Action Complaint, ¶¶ 62(a), 66. The indirect purchasers are allegedly being forced to purchase a tied product, namely Roundup herbicide. This tying arrangement is being enforced through the technology user agreements that the indirect purchasers enter into at the time of GMGT seed purchase. Hampton Pugh is allegedly being "required" by Monsanto and Delta Pine to make the indirect purchasers enter into the technology user agreements at the time of their GMGT seed purchase. This allegedly unlawful conduct is not of the same cloth as that

affecting the indirect purchasers. In fact, the court does not believe the conduct amounts to an unlawful tying arrangement at all.[18] Rather, the conduct appears to be the type of anticompetitive conduct akin to "coerced participation in an unlawful scheme." *See Lowell*, 177 F.3d at 1230 n.5.[19] Such conduct is actionable, and the court believes that under the standards governing notice pleading – even in the antitrust context – the direct purchasers have set forth sufficient allegations to state a claim of this type. *See id.*

These conclusions likely telegraph the court's conclusion with respect to the other allegations of misconduct set forth in the complaint. The court believes that the complaint, fairly read in a light favorable to both sets of plaintiffs, alleges that the direct purchaser plaintiffs were involved in the vertical conspiracy that injured the indirect purchaser plaintiffs. The allegations important to this conclusion are:

---

[18] As Monsanto argues in its motion to dismiss, Hampton Pugh brings no tying claim because it does not allege that it was forced to purchase a tied product. Plaintiffs respond rather ambiguously that

> . . . the distributor plaintiffs likewise are directly harmed because they cannot sell competitive products to their customers who license the GMGT technology as part of their purchase of cottonseed nor to others who have signed the TUA and who have agreed not to purchase competing brands of glyphosate herbicides. Thus, the distributor plaintiffs likewise are directly harmed by the tying arrangement Monsanto and Delta Pine force upon distributors like Hampton Pugh . . . .

Doc. # 54, p. 18. The direct purchaser plaintiffs do not show, however, how the so-called tying arrangement forced a second, tied product, upon them. *See In re Visa Check/MasterMoney Antitrust Litigation*; 280 F.3d 124, 134 (2d Cir. 2001); *United States v. Microsoft Corp.*, 253 F.3d 34, 85 (D.C. Cir. 2001); *see also Southern Card & Novelty, Inc. v. Lawson Mardon Label, Inc.*, 138 F.3d 869, 874 (11th Cir. 1998) ("A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'" (quoting *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 462 (1992) (quoting *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5-6 (1958))).

[19] The allegations in the complaint further substantiate this conclusion: "Plaintiff Hampton Pugh was in fact required to agree to the foregoing scheme in order to sell GMGT upland cotton seed utilizing "Roundup Ready" technology. Amended Class Action Complaint, ¶ 72.

- Hampton Pugh Company is engaged in the business of selling agricultural seeds and supplies.  During the relevant time, Hampton Pugh Company purchased for resale upland cotton seed from Delta Pine . . . . In addition, Hampton Pugh Company purchased "Roundup" herbicide from Monsanto.  Amended Class Action Complaint, ¶ 7.

- . . . Wiggins Farm [Forest Wiggins and Terry Wynne] purchased upland cotton seed from Delta Pine, including GMGT seed . . . . In addition, Wiggins Farm [and Messrs. Wiggins and Wynne] purchased "Roundup" herbicide from Monsanto.  The genetically modified upland cottonseed is sold by Delta Pine through distributors under a licensing agreement with Monsanto.  The herbicide is sold by Monsanto through distributors. Amended Class Action Complaint, ¶¶ 8, 9; *see also* ¶ 10.

- Monsanto and Delta Pine also required their distributors (such as Hampton Pugh) to condition the sale of their proprietary GMGT cotton seed on the requirement that the purchaser thereof agree to the TUA and other requirements . . . .  Amended Class Action Complaint, ¶ 39.

- As part of their scheme in restraint of trade, Monsanto and Delta Pine also required their distributors to condition the sale of their proprietary GMGT upland cotton seed on the requirement that the purchaser thereof agree to the TUA and other requirements tying the sale of the GMGT upland cotton seed to the purchaser's use of "Roundup" to the exclusion of competitors substantially similar and interchangeable glyphosate herbicides.  This tying arrangement results in an unlawful and unreasonable restraint on trade and competition in that the distributors are prohibited by Monsanto and Delta Pine from selling any competitor's glyphosate herbicides (on which the distributor could realize greater income) in connection with the sale of Monsanto and Delta Pine's GMGT upland cotton seed.  Plaintiff Hampton Pugh was in fact required to agree to the foregoing scheme in order to sell GMGT upland cotton seed utilizing "Roundup Ready" technology.  Amended Class Action Complaint, ¶ 72.

These allegations show how the direct purchaser plaintiffs acted as co-conspirators and/or in combination with the named defendants by requiring the indirect purchaser plaintiffs to enter into technology user agreements as a condition of purchasing GMGT seed.  That the direct purchasers acted at the behest of the named defendants and as a condition of their

receipt of GMGT seed for resale does not eradicate the behavior or the fact that it created a relationship between the parties to which the antitrust laws are applicable.

The court believes that this conclusion is favorable to both sets of plaintiffs. First and foremost, the conclusion arises from the allegations of the complaint and the logical and reasonable inferences stemming therefrom. Second, the conclusion provides the necessary factual underpinnings for the direct purchaser's so-called tying claim – that is, a claim akin to the one discussed *supra*. *See Lowell*, 177 F.3d at 1230 n.5. Third, this conclusion allows the indirect purchaser plaintiffs to escape the bar that is the *Illinois Brick* doctrine and maintain those claims predicated on the defendants' allegedly unlawful behavior in the upland cottonseed market (e.g., price fixing), in violation of §§ 1 and 2 of the Sherman Act.

**B. The Remaining Antitrust Arguments**

As for the remaining arguments proffered by the defendants, the court finds them to be either without merit or inappropriate at this juncture. Several arguments quibble with specific allegations in the complaint – for example, the existence of motive on the part of Delta Pine, the possession of market share by Monsanto, or the exercise of anticompetitive conduct by either defendant. These are issues improperly resolved on the motion to dismiss stage. The plaintiffs clearly have work ahead of them in terms of proof. But work ahead of them they do have. As for the more legally nuanced arguments proffered by Monsanto – for example, the alleged lack of merit of Count 2 given the fact that plaintiffs do not compete with the defendants in the relevant markets, or the proprietary of market share aggregation as a general theory – the court notes that the authorities cited by Monsanto in support of its position are either inapposite or represent one of several competing views,

neither of which the court finds particularly compelling in the absence of a more substantive factual baseline. *Cf. Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473 (1962) ("[S]ummary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot.").[20] For purposes of this opinion, however, the court is satisfied that the plaintiffs have stated claims for which relief may be granted, and have alleged sufficient facts to demonstrate the potential for success. The complaint is certainly not a model of pleading, but it is more than a ragtag collection of conclusory allegations.

The plaintiffs should be clear, however, as to the scope of the court's conclusions with respect to the antitrust claims alleged. Based the complaint, the court believes that the indirect purchaser plaintiffs have set forth claims in counts 1, 2 and 3 sufficient to survive the instant motions. The court also believes that the direct purchasers have stated a claim pursuant to footnote five in *Lowell*. This claim is not a tying claim in the classical sense, but it is a viable claim. The direct purchaser plaintiffs are not, however, proceeding with claims predicated on the defendants' allegedly unlawful behavior in the upland cottonseed market (e.g., price fixing) under §§ 1 and 2 of the Sherman Act. This conclusion is based upon the fact that the complaint alleges that the direct purchaser plaintiffs are part of the vertical conspiracy involving the named defendants. Insofar as the direct purchasers have been

---

[20] The court does note here that the complaint is somewhat ambiguous as to the time period at issue in this action: whether the period is limited to the years Monsanto sold cotton seed or whether the period stretches to present day. In light of the necessity of market activity, the absence of any participation in the relevant market by Monsanto – beyond the licensed use of its technology by Delta Pine – likely cabins the complaint to the years during which Monsanto actually sold seed. However, these issues will be reviewed at a later time.

injured by an alleged coerced participation in this conspiracy, their claim is pursuant to footnote 5 in *Lowell*. Insofar as an antitrust injury has been perpetrated in contradiction to these provisions, the indirect purchaser plaintiffs are the proper plaintiffs to vindicate said wrongs. The court is, of course, inclined to consider amendments to the complaint if the plaintiffs believe that the ambiguities contained therein are leading the court to construe these claims in a manner not otherwise intended. The plaintiffs should be advised, however, that but for the applicability of the vertical conspiracy exception as discussed *supra*, the *Illinois Brick* doctrine would be applicable to the indirect purchaser plaintiffs, insofar as §§ 1 and 2 Sherman Act claims described *supra* are concerned.[21] Any request to revise the complaint that is nothing more than a renewed effort to circumvent *Illinois Brick* will meet the proverbial ton of bricks.

### C. The Unjust Enrichment Claims

Finally, the court addresses the unjust enrichment claims of the plaintiffs. The claims are advanced as to both sets of plaintiffs, and allege in pertinent part that

> The wrongful acts of defendants in charging and accepting a supra-competitive price for "Roundup" in its various formulations as alleged herein has resulted in an unjust enrichment to them to the detriment of plaintiffs and members of both classes. Moreover, their monopoly power has allowed Monsanto to charge excessive fees for the use of its technology, and allowed Delta Pine to obtain excessive royalty payments tied to the sale of cotton seed containing Monsanto technology, and further to damage competition in the genetically modified seed market allowing the defendants' to continue to charge supra-competitive prices. Amended Class Action Complaint, ¶ 80.

---

[21] The court also notes, but declines to consider at this time, whether plaintiffs' counsel can competently and adequately represent the interests of both sets of plaintiffs. Based upon the allegations of the complaint, the direct purchaser plaintiffs have interests in opposition to those of the indirect purchaser plaintiffs. Indeed, they could have well been named as defendants in the action. *Cf. Lowell*, 177 F.3d at 1230-31.

The defendants contend, *inter alia*, that the defense of voluntary payment applies to the instant facts, thereby warranting the dismissal of these claims in their entirety. The plaintiffs contend that the defense of voluntary payment is inapplicable because

> the payments by the farmers to defendants were made under extreme economic duress imposed by defendants' misuse of their market power to effectively deprive the farmers of any choice but to buy defendants' products at artificially inflated prices (particularly as to glyphosate herbicides) if the farmers were to continue to earn their livelihood.

Doc. # 54, p. 27. The court is not persuaded.

The complaint set forth a time frame purportedly demarcating the injuries afflicted upon the plaintiffs as between January 1, 1996, to present. Amended Class Action Complaint, ¶¶ 43, 44. The complaint also sets forth the market shares of the defendants. *See supra* discussion. While the numbers alleged are important with respect to the antitrust claims set forth, the court believes they have an equally significant importance with respect to the unjust enrichment claims. From 1996 through 1998, genetically modified cotton seed (the focus of this action) occupied less than half of the entire upland cotton seed market. Indeed, in the years 1996 and 1997 the market shares were 12 percent and 23 percent respectively.

To say then that the plaintiffs were under economic duress to purchase the defendants' products during this time is a gross misapplication of the law. "Duress is defined as subjecting a person to improper pressure which overcomes his will and coerces him to comply with demands to which he would not yield if acting as a free agent." *Head v. Gadsden Civil Serv. Bd.*, 389 So. 2d 516, 519 (Ala. Civ. App. 1980); *see also Stone v. Mellon Mortg. Co.*, 771 So. 2d 451, 457-58 (Ala. 2000). With genetically modified seed

occupying such a less-than-dominant position in the entire upland cotton seed market during this time, the plaintiffs clearly had a reasonable alternative, and cannot be said to have been so unreasonably pressured as to have lost their will to choose. *See Stone*, 771 So. 2d at 457; *see also Int'l Paper Co. v. Whilden*, 469 So. 2d 560, (Ala. 1985) ("Unless unlawful or unconscionable pressure is applied by the other party to induce the entering into a contract, there is not economic compulsion amounting to duress." (quoting *Chouinard v. Chouinard*, 568 F.2d 430, 434 (5th Cir.1978)). Moreover, the plaintiffs' willingness to enter into and enforce technology user agreements during this pre-market dominant time ratifies the plaintiffs' continued acceptance of those agreements during the years of 1998 and beyond. *Cf. Stone*, *supra*; *see also Ponder v. Lincoln Nat'l Sales Corp.*, 612 So. 2d 1169, (Ala. 1992) ("Furthermore, merely taking advantage of another's financial difficulty is not duress. Rather, [a] party will ordinarily be held to an agreement even though his adversity has been taken advantage of, as long as the contract has been shaped by a prevailing market force." (citations and quotations omitted)). The question might be a different one (at least for purposes of these motions to dismiss) were the court faced with a situation where the defendants, upon successfully inducing the plaintiffs to become customers, suddenly increased the cost of their products, knowing full well that the plaintiffs were in no position to abandon their use. This is not the situation, however, and accordingly, the court finds that the complaint fails to state a claim for unjust enrichment. Defendants' motions as to those claims are therefore due to be and hereby granted.

## V. Conclusion

The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this 28th of May, 2002.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE